UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL MOSES, ET AL.                                CIVIL ACTION

VERSUS                                               NO: 25-546

WELLS FARGO BANK, N.A.                               SECTION: "A" (5)

## ORDER AND REASONS

The following motion is before the Court: **Motion to Dismiss for Failure to State a Claim (Rec. Doc. 7)** filed by the defendant, Wells Fargo Bank, N.A. ("Wells Fargo"). The plaintiffs, Dr. Michael Moses and Kathy Moses ("Plaintiffs"), oppose the motion. The motion, submitted for consideration on July 23, 2025, is before the Court on the briefs without oral argument. For the reasons that follow, the motion is **GRANTED IN PART AND DENIED IN PART**.

### I.    Background

Plaintiffs have brought this action against Wells Fargo alleging that Wells Fargo reneged on a legally binding agreement to lend them money at a locked in interest rate. Plaintiffs had sought financing from Wells Fargo to build their dream vacation home in Pensacola, Florida. In 2022 Plaintiffs began working with a Wells Fargo mortgage consultant, who advised them that for a fee Plaintiffs could lock in a great rate. (Rec. Doc. 1, Complaint ¶ 10). At the time interest rates were at historic lows and predicted to increase. On July 19, 2022, Plaintiffs paid Wells Fargo a fee of $15,750.00 to lock in the interest rate of 3.750% for 540 days, or until December 27, 2023. (*Id.* ¶ 13). The Interest

Rate Lock Agreement is dated July 7, 2022. (Rec. Doc. 7-2, Exhibit A).

Plaintiffs allege that Wells Fargo made representations to them that the loan that they hoped to attain could be used at the Pensacola property. (Complaint ¶ 11). Plaintiffs' ownership of the Pensacola property was a "leasehold" because beachfront land near Pensacola Beach is federally owned and administered by the State of Florida. (*Id.* ¶ 17).

Wells Fargo did not offer construction loans but Plaintiffs allege that Wells Fargo advised them that they could obtain a construction loan with another bank (which they did) and then later refinance the debt with a loan from Wells Fargo at the favorable rate that they had locked in. (*Id.* ¶ 14).

On September 8, 2022, Plaintiffs received a Commitment Letter (Rec. Doc. 7-3, Exhibit B), from Wells Fargo stating that their loan application had been approved. (Complaint ¶ 19). Construction began in November 2022 but took longer than anticipated. (*Id.* ¶ 18). Plaintiffs allege that throughout the course of construction they obtained several extensions of their original Interest Rate Lock Agreement and were assured that Wells Fargo would provide a loan at the locked in rate. (*Id.* ¶ 19).

Construction was completed in June 2024 and by this time interest rates had risen significantly. (*Id.* ¶ 21). Plaintiffs allege that Wells Fargo began a concerted campaign of fraud and ill practice whereby it sought to prohibit the loan from closing at the locked in rate that it was contractually obligated to honor. (*Id.* ¶ 23). Plaintiffs allege that Well Fargo repeatedly postponed closing on the loan as one-by-one it sought to

invoke each of the exceptions listed in the rate lock agreement that would allow Wells Fargo to avoid lending money at the locked in rate. (*Id.* ¶ 25).

In May of 2024 Wells Fargo informed Plaintiffs that it would not be able to lend them money at the locked in rate because Dr. Moses's credit score had dropped. (Complaint ¶ 51). Although his credit score had in fact dropped, the only activity reflected on Dr. Moses's credit report was the repeated credit checks initiated by Wells Fargo every three months for a period of nearly two years. (*Id.* ¶ 53). Plaintiffs allege that prior to citing the dropped credit score, Wells Fargo attempted to renege on the rate lock agreement by claiming that the property had appraised too low and by suggesting that Plaintiffs did not have sufficient income to obtain the loan. (*Id.* ¶¶ 35, 46). In fact, the first post-construction appraisal had come back significantly lower than anticipated.

Next Wells Fargo told Plaintiffs that it was uncomfortable providing the loan because the property was a leasehold. (*Id.* ¶ 57). Plaintiffs allege that Wells Fargo knew all along that the property was a leasehold and that Wells Fargo had routinely provided loans for property on leased Pensacola Beach land.[1] (*Id.* ¶ 58).

In early December of 2024 Plaintiffs were informed that Wells Fargo was denying the loan. (*Id.* ¶ 60). The denial letter from Wells Fargo cited three reasons for the denial: amount of credit required is too high relative to your income, amounts owed are too high

---

[1] Wells Fargo argues that loan decisions regarding other borrowers' plans for Pensacola Beach are irrelevant and the Court agrees. Even though the leasehold aspect of the property was one problem that Wells Fargo had in extending the loan, numerous factors go into the loan decision. Thus, Plaintiffs will not be allowed to conduct discovery into other borrowers' transactions with Wells Fargo.

relative to your income, and property type does not meet investor/lender requirements.[2] (*Id.* ¶ 61). Plaintiffs contend that Wells Fargo simply did not want to honor the rate lock agreement given that interest rates had risen precipitously so it fraudulently and intentionally broke its contract with them. (*Id.* ¶ 64).

Plaintiffs filed this lawsuit alleging breach of contract, fraud/fraudulent inducement, unfair trade practices, negligent misrepresentation, and in the alternative, detrimental reliance. Plaintiffs seek a litany of damages. (Complaint ¶ 104). Plaintiffs allege that due to Wells Fargo's actions they paid interest on their extremely high-interest construction loan for the several months that Wells Fargo strung them along until finally denying their loan application. (*Id.* ¶ 68). The loan that Plaintiffs ultimately obtained (from another bank) had far less favorable terms than the loan that Plaintiffs had been promised by Wells Fargo. (*Id.* ¶ 67).

Wells Fargo's position is that the Interest Rate Lock Agreement and the Commitment Letter were premised on several conditions and that when it came time to close on the loan Plaintiffs simply did not meet them. Therefore, according to Wells Fargo, it had no obligation to give them a loan at the locked in rate or at any rate for that matter, and that the refusal to give them a loan is not actionable under any of the legal theories that Plaintiffs rely upon in their complaint.

Plaintiffs' position is that Wells Fargo's cited reasons for ultimately denying the loan were pretexts for the real reason that Wells Fargo denied the loan—interest rates

---

[2] Plaintiffs have not provided a copy of the denial letter.

had risen precipitously, and the locked in rate was no longer a good deal for the bank. Plaintiffs argue that the pretextual reasons were either inaccurate, manipulated by Wells Fargo, or known by Wells Fargo all along.

Via the instant Rule 12(b)(6) motion, Wells Fargo moves to dismiss the complaint in its entirety. The parties' arguments are addressed below.

II.     Discussion

The central issue in a Rule 12(b)(6) motion to dismiss is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). To avoid dismissal, a plaintiff must plead sufficient facts to "state a claim for relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (quoting *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). Legal conclusions must be supported by factual allegations. *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950).

In the context of a Rule 12(b)(6) motion to dismiss the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308 (2007); *Scheuer v. Rhodes*,

416 U.S. 232, 236 (1974); *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004)). However, the foregoing tenet is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949. Thread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550, U.S. 544, 555 (2007)).

## Counts 1 & 2—Breach of Contract

Count 1 alleges that the Interest Rate Lock Agreement was a promise to extend a loan at a certain interest rate and that Wells Fargo breached the agreement when it refused to give Plaintiffs a loan at the agreed upon rate. Count 2 alleges that the Commitment Letter was a promise to underwrite a loan at a certain rate and that Wells Fargo breached the Commitment Letter when it denied their loan application.[3]

In support of its motion to dismiss the breach of contract claims, Wells Fargo argues that neither the Interest Rate Lock Agreement nor the Commitment Letter was a contract. Wells Fargo characterizes the Interest Rate Lock Agreement as "an agreement to agree," and the Commitment Letter as "a permissive agreement." Wells Fargo points out that both documents contained express pre-conditions that Plaintiffs did not meet and that their complaint is rife with concessions to that effect.

---

[3] Plaintiffs did not provide a copy of the Interest Rate Lock Agreement or the Commitment Letter. Wells Fargo provided those to the Court as attachments to its motion to dismiss. Although a district court must ordinarily limit itself to the contents of the complaint when deciding a motion to dismiss, the court can consider documents attached to a motion to dismiss when they are referred to in the plaintiffs' complaint and are central to their claims. *Collin v. Morgan Stanly Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). The Interest Rate Lock Agreement and the Commitment Letter satisfy those requirements.

In their opposition, Plaintiffs characterize the Commitment Letter and the Interest Rate Lock Agreement as contracts subject to suspensive conditions. As to those conditions, Plaintiffs point out that they have alleged that they either met the conditions, and if they did not, it was because of Wells Fargo's bad faith conduct. Plaintiffs argue that their allegations in support of their breach of contract claims are sufficient to withstand dismissal, and that Wells Fargo's arguments are based on issues that are factual in nature and premature at this stage of the litigation.

Plaintiffs' contention that Wells Fargo's denial of their loan application constituted a breach of the Interest Rate Lock Agreement (upon which Count 1 is based) is untenable. The Interest Rate Lock Agreement opens with the explanation that that Wells Fargo is writing "to confirm the interest rate for your *proposed* loan." (Rec. Doc. 7-2, Interest Rate Lock Agreement at 1) (emphasis added). The document references the separate "loan application" in several places, and expressly states that the rate lock fee would be refunded if "we deny your [loan] application."[4] (*Id.* at 2). The verbiage of the Interest Rate Lock Agreement allows for no confusion insofar as the lending decision itself is being made elsewhere (the loan application). In fact, the Interest Rate Lock Agreement expressly states: "This agreement is *not* a commitment to lend." (*Id.* at 2) (emphasis added).

In sum, the unambiguous text of the Interest Rate Lock Agreement forecloses

---

[4] The Interest Rate Lock Agreement states that the fee is non-refundable unless the loan application is denied. (Interest Rate Lock Agreement at 2). Plaintiffs do not allege that Wells Fargo kept the fee ($15,750.00) so the Court assumes that the fee was returned to Plaintiffs when their loan was denied.

any plausible assertion that it contained a promise to actually grant a loan at the locked in rate or at any rate for that matter. Thus, as a matter of law, Plaintiffs' breach of contract claim grounded on the Interest Rate Lock Agreement fails. Count 1 is DISMISSED.

The Commitment Letter sent to Plaintiffs on September 8, 2022, informed them that their loan application had been approved and that Wells Fargo would honor the commitment to the best of its ability. (Rec. Doc. 7-3, Commitment Letter at 1 & 2). The interest rate quoted in the Commitment Letter is the rate from the Interest Rate Lock Agreement. Importantly, the Commitment Letter does not guarantee or promise that a loan would ultimately be extended at the locked in interest rate (or at any interest rate) because the Commitment Letter contains many caveats and scenarios that allow Wells Fargo to reconsider the loan approval decision and to deny the loan. The parties have engaged in numerous arguments over the proper legal characterization of the Commitment Letter but semantics aside, the Commitment Letter, when viewed as a promise to lend money at the locked in rate (which is how Plaintiffs view it), was by no means absolute. The Commitment Letter is plausibly characterized as a *conditional* obligation to approve a loan at the locked in interest rate.[5]

Given that the Commitment Letter was based on the financial information

---

[5] Article 1767 states:
    A conditional obligation is one dependent on an uncertain event.
    If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.
    If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory.
La. Civ. Code art. 1767.

provided with the loan application, one area where the lender gave itself an out was if a change in the borrower's financial circumstances were to occur between the time of the loan approval decision and the loan closing (which in this case would have been at least two years apart). The Commitment Letter plainly states in a section entitled "Don't Change a Thing" that the loan commitment was based on "information you provided, including your **current income**, credit rating, debts and property condition." (Commitment Letter at 1) (emphasis added). The clear import of this language is that the borrower is on notice that if something changes in the information provided in the loan application then approval of the loan may be affected. The Commitment Letter advises that "[i]f there are any material changes in your financial status, the information you provided in your application, or the condition of the property, that would cause your loan to no longer meet applicable regulatory requirements, the terms of this loan commitment may be reconsidered or withdrawn." (Commitment Letter at 2). Under the section entitled "Modifications and Withdrawals" the borrower is told to contact the bank immediately if "[y]ou have any change in income," and that this circumstance "may cause the terms of this commitment to change or to be reconsidered." (*Id.* at 2).

Under the section entitled "Appraisal" the borrower is advised that "[i]f the property you selected does not meet lender or investor requirements, this commitment shall be void." (*Id.* at 5).

Of the three reasons given for the denial, two of them pertain to income and one pertains to the property "type" not meeting investor/lender requirements.

It is undisputed that Dr. Moses's income from his medical practice had dropped

from the income level stated in the loan application because he had elected to work only a half-time schedule to allow time to supervise the Pensacola construction and to renovate his New Orleans family home. (Complaint ¶ 43). It is also undisputed that the Pensacola Beach property "type" was a leasehold given that the land was owned and would continue to be owned by the federal government.

The denial letter presumably does not mention that the first post-construction appraisal on the property reported an appraised value significantly lower than what had been reported two years prior. (Complaint ¶¶ 27-28). Plaintiffs complain that Wells Fargo was all too eager to adopt the findings of that appraisal as a reason to deny the loan. (*Id.* ¶¶ 35-36). Subsequent appraisals reported a much higher value. (*Id.* at ¶¶ 33 & 34).

The denial letter also presumably does not mention that by May 2024 Dr. Moses's credit score had dropped and that Wells Fargo informed Dr. Moses that due to his lower credit score the loan could not be approved. (Complaint ¶ 51). Dr. Moses does not dispute that his credit score had dropped but he attributes that to the repeated credit checks from Wells Fargo every three months for a period of nearly two years. (*Id.* ¶ 53).

Plaintiffs highlight Wells Fargo's attempts to withdraw its loan commitment based on the property's first appraisal and Dr. Moses's decreased credit score even though these are not cited as reasons supporting the loan denial decision because Plaintiffs believe that it helps to demonstrate that Wells Fargo was determined to find a way to escape the loan commitment once interest rates had risen. In further support of this contention, Plaintiffs contend that Wells Fargo was not interested in hearing about their

income from other sources or their numerous other assets and holdings that would have allowed them to demonstrate that they would have been able to cover the loan payments. And Plaintiffs allege that Wells Fargo had known for years that the property was a leasehold. (Complaint ¶ 58).

It is hardly incredulous to suggest that Wells Fargo wanted to avoid extending a $2.8 million dollar loan at such a low rate once rates had risen, and the Court will accept as true Plaintiffs' allegation that the "real" reason that Wells Fargo denied the loan was that it became a bad business move once interest rates increased. But given that Wells Fargo relied on at least one of the enumerated conditions for reconsidering the loan commitment, *i.e.*, change in income, and given that the condition was triggered by Dr. Moses's decrease in income, the "real" reason for the denial is immaterial and not indicative of bad faith on Wells Fargo's part.[6] *See Petro-Marine Underwriters, Inc. v. Cox Oper., LLC*, 612 F. Supp. 3d 619, 629 (E. D. La. 2020) (citing *Whitney Bank v. SMI Cos. Glob., Inc.*, 949 F.3d 196, 210 (5th Cir. 2020)). Count 2 is DISMISSED.

### Count 3—Fraud/Fraudulent Inducement

Plaintiffs allege that Wells Fargo engaged in fraud because it induced them to enter into the Interest Rate Lock Agreement all the while knowing that it would not extend a loan to them at that rate if interest rates were to rise.

Under Louisiana law, "[f]raud is a misrepresentation or a suppression of the truth

---

[6] The Commitment Letter was not a binding document purchased for non-refundable consideration like the commitment letter in *Clearview Palms Partnership v. Hibernia National Bank*, 573 So. 2d 1206 (La. App. 4th Cir. 1991).

made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. Civ. Code art. 1953. A fraud claim cannot be predicated on statements that are promissory in nature or relating to future events. *Taylor v. Dowling Gosslee & Assoc., Inc.*, 22 So. 3d 246, 255 (La. App. 2nd Cir. 2009) (citing *Swann v. Magouirk*, 157 So. 2d 749 (La. App. 2nd Cir. 1963)).

Wells Fargo argues that Plaintiffs' fraud claim is based on the failure to perform in the future, which does not constitute fraud under Louisiana law. Plaintiffs' point out however, that the case law draws a distinction between the failure to perform a future promise, which is not actionable as fraud, and fraud based on a promise made where there was never an intention to perform as promised, which is actionable. *Taylor*, 22 So. 3d at 255 (citing *Sun Drilling Prods. Corp. v. Rayborn*, 798 So. 2d 1141 (La. App. 4th Cir. 2001)). And Plaintiffs' contention is that Wells Fargo never intended to honor its promise to grant a loan at the locked in rate if interest rates rose precipitously, which they did.

Ignoring that the complaint contains no facts to support Plaintiffs' belief that Wells Fargo never intended to honor the rate lock commitment, it remains that the intent to defraud is an element of every fraud claim. *Id.* Plaintiffs allege no facts to render it plausible that Wells Fargo lied to them about giving them a loan at the locked in rate in order to obtain an unjust advantage for itself (the rate lock fee was fully refundable once the loan was denied) or to cause a loss to Plaintiffs. Count 3 is DISMISSED.

### Count 4—Louisiana Unfair Trade Practices

Plaintiffs' Louisiana Unfair Trade Practices, La. R.S. § 51:1401, *et seq.*

("LUTPA") claim is premised on the allegation that Wells Fargo engaged in fraud to avoid underwriting their loan at an unfavorable rate. (Complaint ¶ 95).

Wells Fargo argues that Plaintiffs' LUTPA claim is untimely because it was not brought within one year of September 8, 2022, which is when the Commitment Letter was issued.

Under LUTPA, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. La. R.S. § 51:1405(A). Acts constituting unfair or deceptive trade practices are not specifically defined in the statute, but are determined by the courts on a case-by-case basis. *Walker v. Hixson Autoplex of Monroe, L.L.C.*, 245 So. 3d 1088, 1094–95 (La. App. 2nd Cir. 2017) (citing *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053 (La. 2010)). In general, acts which comprise unfair trade practices involve fraud, deception, misrepresentation, breach of fiduciary duty, or other unethical conduct. *Id.* To succeed on a LUTPA claim, the plaintiff must show that the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious. *Id.* (citing *Cupp Drug Store, Inc. v. Blue Cross & Blue Shield of La., Inc.*, 161 So. 3d 860 (La. 2nd Cir. 2015)). The span of prohibited practices under LUTPA is extremely narrow. *Id.* (citing *Cheramie*, 35 So. 3d at 1053).

The Court is not impressed with Wells Fargo's timeliness argument because Plaintiffs have alleged that they were assured (more than once) after the Commitment Letter was issued that the loan would be granted at the locked in rate. Due to the continuing nature of the alleged violation, timeliness is not likely a problem. *See Bihm v.*

*Deca Sys., Inc.*, 226 So. 3d 466, 489 (La. App. 1st Cir. 2017).

Nonetheless, the Court is not persuaded that the conduct alleged in this case rises to the level of a LUTPA violation. The conduct alleged does not implicate fraud nor is it immoral, unethical, oppressive, or unscrupulous. Plaintiffs might have had a better claim if Wells Fargo had not been able to rely upon legitimately triggered conditions that allowed it to avoid issuing the loan at the locked in rate. Count 4 is DISMISSED.

### Count 5—Negligent Misrepresentation

Plaintiffs allege that Wells Fargo made either intentional or negligent representations to them to induce them to enter into the Interest Rate Lock Agreement to their loss.

Although Plaintiffs' whole complaint is grounded on the contention that Wells Fargo never intended to honor the Interest Rate Lock Agreement even though it told them otherwise—in other words on allegedly intentional misrepresentations—they make no arguments regarding intentional conduct nor could they. Intentional misrepresentation must be supported by facts suggesting an intent to deceive. *Ryan v. Nat'l Football League, Inc.*, No. 19-1811, 2019 WL 3430259, at *6 (E.D. La. July 30, 2019) (citing *Kadlec Med. Ctr. v. Lakeview Anesth. Assoc.*, 527 F.3d 412, 418 (5th Cir. 2008)). Plaintiffs allege no such facts.

As for the claim for negligent misrepresentation, the elements are (1) the defendant, in the course of its business or other matters in which it had a pecuniary interest, supplied false information; (2) the defendant had a legal duty to supply correct information to the plaintiff; (3) the defendant breached its duty, which can be breached

by omission as well as by affirmative misrepresentation; and (4) the plaintiff suffered damages or pecuniary loss as a result of its justifiable reliance upon the omission or affirmative misrepresentation. *Id.* (citing *VFS US, LLC v. Vaczilla Trucking, LLC*, No. 15-2226, 2016 WL 3655908, at *2 (E.D. La. July 8, 2016)). The foregoing four elements apply when no fiduciary relationship exists between the parties.[7] *Id.* (citing *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1016 (La. 1993)).

Plaintiffs allege that they were told (more than once) by representatives of Wells Fargo that the bank would close on the loan at the locked in rate. The motion to dismiss Count 5 is DENIED.

### Alternative Count—Detrimental Reliance

Plaintiffs allege (in the event that the Court finds that there was no contract), that they were induced to rely upon Wells Fargo's representations that it would grant them a loan at the locked in rate. (Complaint ¶¶ 102-03).

Article 1967, Cause Defined; Detrimental Reliance, states in relevant part:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.

La. Civ. Code art. 1967.

To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable

---

[7] Wells Fargo's argument to dismiss the claim for negligent misrepresentation is premised on the incorrect assertion that the existence of a fiduciary duty is an element of the claim. It is not. Insofar as the loan transaction was concerned, which is the only transaction relevant to this lawsuit, Wells Fargo did not stand in a fiduciary relationship with Plaintiffs.

reliance; and (3) a change in position to one's detriment because of the reliance. *Suire v. Lafayette City-Par. Consol. Gov't*, 907 So. 2d 37, 59 (La. 2005) (citing *Lakeland Anesthesia, Inc. v. United Healthcare of La., Inc.,* 871 So.2d 380, 393, (La. App. 4th Cir. 2004)). Significantly, to prevail on a detrimental reliance claim, Louisiana law does not require proof of a formal, valid, and enforceable contract. *Id.* (citing *Babkow v. Morris Bart, P.L.C.,* 726 So. 2d 423, 429 (La. App. 4th Cir. 1998)). The doctrine of detrimental reliance is "'designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence.'" *Id.*

Plaintiffs allege that they were told (more than once) by representatives of Wells Fargo that the bank would close on the loan at the locked in rate. They relied on that representation to their detriment because they did not pursue financing with another bank. Ultimately, Wells Fargo refused to grant a loan at the locked in rate. The motion to dismiss alternative Count 6 is DENIED.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Dismiss for Failure to State a Claim (Rec. Doc. 7)** filed by the defendant, Wells Fargo Bank, N.A., is **GRANTED IN PART AND DENIED IN PART** as explained above.

August 12, 2025

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE